Our final case today is Eli Lilly v. Teva Pharma Eli Lilly v. Teva Pharma Thank you, Your Honor. May it please the Court, there are three groups of patents that issue in this appeal. The first are the bone loss patents. The District Court's non-obviousness ruling on the bone loss patents are based on fact-finding that directly contradicts the District Court's core finding on enablement, and that was clear error. The District Court found that the prior art had already suggested riloxepine for treating bone loss, but then the District Court also found that people in the art would not have accepted this suggestion because they believed riloxepine was not sufficiently bioavailable to treat humans at all. The District Court then found that the bone loss patents overcame these supposed human bioavailability concerns by disclosing a conjugate study that had been performed in rats by a Lilly inventor, scientist Larry Black. The problem is that the District Court's non-obviousness ruling ultimately hinges on the testimony of Lilly's in-house bioavailability expert, Dr. Lindstrom. Dr. Lindstrom's testimony was the only evidence that people viewed the bioavailability data as causing an issue with human use. Isn't that a pretty pervasive part of this record, the bioavailability problems? We see it permeating much of the early work with riloxepine and others. That's correct, Your Honor. Why wouldn't that, one of skill in the art, been taught away from expecting this to have any postmenopausal application to osteoporosis? For one thing, Your Honor, as you said, a lot of this was early studies, and it was well known even at the time Lilly filed its earlier riloxepine application. Lilly had filed a previous application on riloxepine for human use that was claiming a breast cancer application. A lot of the bioavailability issue, the fact that the riloxepine molecule was heavily conjugated, was susceptible to conjugation and that sort of thing, all was known back then. But look even at the Jordan reference. The Jordan reference talks about bioavailability problems and so says, stick with tamoxifen. It doesn't even mention riloxepine because of the bioavailability, I presume. No, Your Honor. Actually, the Jordan article does not discuss bioavailability problems per se. The issue is, at the beginning of the Jordan article, Jordan mentions that he's testing tamoxifen and riloxepine. Yes, and then only tamoxifen comes out at the end. Well, Jordan notes that tamoxifen had already received FDA approval and was in widespread clinical use already for breast cancer. So what Jordan suggests pretty clearly at the beginning of the article is that the clinicians who are already prescribing tamoxifen for breast cancer can look to see the effect on bone. And that was a recommendation that made sense because it was already out. Riloxepine had not been approved, was not up clinically, and so Jordan did not address riloxepine as something that clinicians could look at because they didn't have access. Right, but in the absence of his having done that, it creates a difficult hurdle for you with respect to whether there was a reasonable probability of success, right? You point to his article as establishing that that establishes that there was a reasonable possibility of success, and you're now acknowledging that it doesn't really deal with it. No, Your Honor. We're relying on the Jordan article as prior art showing that riloxepine works in an animal model for postmenopausal osteoporosis. So the initial suggestion of riloxepine for bone loss was there. The issue is whether, as the district court found, whether people skilled in the art would have taken that animal model and extrapolated it to humans. Right, and the answer is, or at least the district court judge's answer in this case, was because of the well-known, well-established pervasive problems of bioavailability, it would be clear that it isn't necessarily the experiments on rats would apply to humans, right? That was the state of the art. I'm sorry. Go ahead. Yeah, that was the district court's finding. But that finding boils down to the court's reliance on Dr. Lindstrom's testimony, and I'll tell you why. Dr. Lindstrom was the only one who interpreted the bioavailability data that was out there and said, this caused people skilled in the art to give up on riloxepine. That's the relevant distinction. There were articles out there. There was a lot of knowledge out there about the conjugation issue and the fact that riloxepine conjugated, but there's no evidence outside of Lilly. There's no documents, no articles, nothing that says, because of this conjugation issue, you shouldn't look at riloxepine. Yeah, but the problem you have is the standard of review here, and we're relying on it. It was a bench trial. The district court made certain back findings. I mean, maybe she believed this particular expert over your interpretation of another study, and we're left with having to review that on a deferential standard of review. Am I wrong about that? No, you're correct, Your Honor. However, our position is that there's a fundamental contradiction in the findings. The district court relied upon Dr. Lindstrom's testimony to take all of this bioavailability data that was out there and translate that to a conclusion that people skilled in the art would have given up. But at the same time, the district court relies on Larry Black's conjugate studies as supposedly overcoming this concern about human bioavailability. Now, the district court made a finding in the fact-finding section that Dr. Lindstrom had given up on riloxepine long after these conjugate studies. So the conjugate studies clearly did not convince Dr. Lindstrom to revive an expectation of success. So if, on the one hand, there is no reasonable expectation of success because Dr. Lindstrom says so, on the other hand, the conjugate studies in rats could not have revived that expectation when it did revive the expectation of Dr. Lindstrom. A lot of the problem is the timing is different. By the time you reach the bone loss patents, they're to be enabled at the time of their filing. At that point, you have two additional things. You have Lilly's clinical studies, which are already underway, showing that this may be work in humans. And then, as we've all noted, you also have the conjugate studies of blacks. So you have something at that later point which would give one of skill in the art a reason to make and use. Your Honor, I think the timing problem is the reverse. The conjugate studies came early, and the court relies on Dr. Lindstrom and in-house skeptics to say later that they had concerns about riloxepine's bioavailability. Well, what's your strongest prior art for obviousness? Well, there's basically the Jordan reference. We've been through that. What's your strongest? The Schreiber patent. Schreiber, I think, is your strongest, but you've got two problems. Besides the bioavailability which we've discussed, Schreiber is all about autoimmune deficiencies. It's not directed to postmenopausal osteoporosis at all. That's correct, Your Honor. It shows it's useful in humans, but it's, again, pointing one of skill in the art towards autoimmune, not towards osteoporosis, right? That's correct, Your Honor, but there's two pieces here. One is whether riloxepine had an effect on bone loss. That's Jordan. The district court came back and said that's all well and good, but people didn't think it could work at all in humans. That's where the Schreiber reference comes in, Your Honor. Schreiber said yes. Moreover, Schreiber actually addressed the bioavailability concerns in the patent and then went ahead and claimed for autoimmune disease in humans, suggesting that it could work. You're right. It did overcome the bioavailability for autoimmune disorders. Where's the connection that it would also overcome postmenopausal osteoporosis bioavailability concerns? Well, the issue that the district court found was whether riloxepine was sufficiently bioavailable, whether there was enough of the drug in circulation to work in humans at all, for anything. So either the argument, I'm sorry, the district court relied on a finding that people skilled in the art at the time thought that this drug was so extensively metabolized it was flushed out of the system. And it was working finally for autoimmune. That is correct in Schreiber. Is there some record evidence that would make that a link to osteoporosis? There's no direct link, Your Honor, between the Schreiber patents and osteoporosis. Again, normally an animal study will predict results in humans, and that happens all the time. Let's just be clear. Whether or not there's a bioavailability problem would be the same whether or not we're dealing with immune diseases or whether we're dealing with osteoporosis? That's correct, Your Honor. The bioavailability issue is whether- So it's a little puzzling here. I mean, the Schreiber patent is what, 91? I don't remember. The Schreiber patent was 88. Pretty early. And Dr. Schreiber at some point comes to Lilly and says, here's my idea. And Lilly persists. You have to assume that they would have embraced an idea that they thought was workable, and their concerns remained at bioavailability, right? Actually, Your Honor, the meeting was before Schreiber filed for the patent. So what that reflects is Schreiber did not have any such concerns. And Lilly disclosed the bioavailability issues, the conjugate studies that he'd done, et cetera. Schreiber then, after that, went ahead and claimed human use, suggesting that people outside of Lilly did not harbor concerns about bioavailability. Lilly, although Lilly turned down Schreiber on that particular proposal, which was for autoimmune diseases- But they looked at it. I mean, he meets with them in August, and they reject him in October. It isn't like they spasmodically rejected him. And they gave some thought to this, right? And they said bioavailability is still out there. Bioavailability was one of the reasons that Lilly mentioned for not going forward with the study. But that was not the core reason, which is demonstrated by the fact that Lilly went on to phase two studies itself. So- That's when Black begins his work. Black began his work in 88. March, yeah. That's correct. And Black's work at that point was simply doing what Jordan had done years earlier, which is testing riloxepine in rats to see if it had an effect on bone. If I may, Your Honor, I'd like to move on to the next issue, which is the low-dose. Sure. The low-dose patent claims riloxepine just like the bone loss patents, riloxepine for treating post-menopausal osteoporosis, but in a specific dose. And the district court found that the claimed dose was a product of routine dose optimization. And it made that finding based on the admissions of Lilly's own witnesses, its own inventor, and its own experts. Now, this Court's precedent establishes that routine dose optimization cannot be inventive as a matter of law. I'm not clear. So you're saying she said that experimentation with respect to dosage would have been routine, but not necessarily the honing in, not necessarily the 60 milligrams would have been discovered, right? No, Your Honor. She said that dose optimization is standard and that there was nothing in this case that was different from any other. Nothing was outside the reach of a person having ordinary skill. So, in other words, if you went to a person having ordinary skill in the art at the time and said, I need to dose this riloxepine, they would have performed these routine dose optimization studies, which look for the lowest effective dose, and they would have come to the claim of invention. But isn't the question whether the use of riloxepine at that dosage level was reasonably expected to produce this beneficial result for bone density loss prevention? The Court did mention that as an issue, but that does not rebut the finding on routine optimization, because regardless of what the initial expectation was, the finding was that people skilled in the art routinely optimize and look for the lowest dose that will get the full effect, and nothing about the initial expectation of whatever they thought previously would affect that analysis. Again, the issue is if you give a person skilled in the art at the time that the application is filed an instruction to find a dose that does this properly, they would come to the claim of invention every time, because all they're doing is applying routine dose optimization, which was well known, and it's done in every case where- Is that the argument you made to the district court, or was it simply- I mean, a lot of this was the low dose patents rise or fall on the bone loss patents being obvious. That's correct, Your Honor. Our argument below was that the low dose- if the bone loss patents were obvious, then the low dose also was obvious under 103, because it didn't disclose anything further because of the routine optimization. What we did not raise below was the double patenting issue, and the double patenting issue is that the claims of the low dose patents are not distinguishable over the claims of the bone loss patents, because, as the court found, that dose was simply the product of routine optimization. There's no inductive distinction. Isn't that argument waived and not subject to the exception? No, Your Honor. I believe it is subject to the exception. The Dynatech case lists five different circumstances in which this court may address a new issue on appeal, and we meet three of those issues. This is a purely legal question. There is no prejudice to Lilly. Lilly did not identify any prejudice in its briefs, and it's a very straightforward issue, routine optimization. Your Honor, it looks like I'm running out of time. Mr. Rice, yes, you have consumed your time. Let's give you back three minutes for rebuttal, and would you give Mr. Lipsy an extra three minutes should he lose it? Thank you, Your Honor. May it please the court, I think the court has perceived rightly that this case turns largely on the unique facts of the case, which are not only richly documented in the contemporaneous record but also fully related in the court's extensive opinion. Just to correct a couple of points, the court is correct. There is a very rich and deep literature dealing with the perceived bioavailability problems coming from the hydroxylation of these molecules. There are three publications by Jordan himself in 1983 and 1984 that are in the record. But Schreiber suggests pretty clearly that at least in the autoimmune area, there's enough bioavailability to address autoimmune deficiencies. Why wouldn't that availability address also osteoporosis? Well, there are two reasons for that, and I'm glad you brought that up. The original Schreiber application was not filed after the meeting with Lilly but before. It was originally filed in March of 1987, and there was no mention at all of the bioavailability problem there. And in fact, the experiment that Schreiber was doing was administering a drug by injection into guinea pigs, which didn't create the bioavailability problem. But we have Schreiber's article in October of 1987 in which he's... And there, in contrast to the patent, there he does mention it. And what does he say? He points out the experience that Lilly had that naloxifene has a short serum half-life due to rapid biotransformation. What's that talking about? That's talking about the glucuronidation and excretion of the drug, the very same problem that Jordan... Well, this is all prior art. You still have to address the question, why doesn't bioavailability extend to all maladies? Why do you wish to limit it to autoimmune in the Schreiber instance? My principal point on Schreiber, as much as I would love to agree with the court and say, oh, yes, it's autoimmune, but my principal point on Schreiber is that that was a statement made in abject ignorance of the significance of the problem that has to be weighed against the 5 or 10 or 15 other scholarly publications from before that until well after that articulating the problem and explaining the problem. And we start back in 1983 and we end in 1995, Your Honor, when Jordan himself learns of the... But our law requires one of skill in the art to rely on Schreiber for all it teaches. It teaches bioavailability. One has to rely, one has to view the prior art in its entirety. And when one views the prior art in its entirety, one sees that that is a discussion of an animal model where the drug was administered by injection for some different person that didn't even address the bioavailability problem, which did not serve to answer at all the question of the very significant bioavailability problem that's reflected consistently... I don't understand. There was a Schreiber patent. Was that in 1991 or some other... Schreiber patent, the original application was in March 1987 based on a... And that dealt with the administration in humans for the autoimmune, right? It wasn't just for humans. It purported to say that, Your Honor. It purported to say that without addressing at all the actual bioavailability problem, which is reflected, for example, in the subsequent publication in 1988 by Dr. Busdar of the failure of the relapse of the clinical trial in cancer. And when you have a document that simply doesn't address a problem and you have 10 or 12 publications that do address it, when you put those all together, you cannot read that patent as saying, Oh, the problem that all of these learned scholars addressed no longer exists. You have to read it as saying, He didn't address it. And that's our contention on trial. Now, there were a couple of other points. The trial judge did not find that what happened here was routine dose optimization. The court said generally it may be routine to do that kind of experiment, but the data here all pointed the other direction. The original experiment, the basic proof of concept study we talked about, it showed that it was fully effective at 600, a high, high dose that they picked in anticipation of the bioavailability. But the range you claimed in the original bone loss patents was covered 60, right? It was like an enormous range, right? It covered an entire genus of molecules, some of which didn't have the bioavailability problem. That's a generic claim. It covers a very large number of molecules, some of which don't have the bioavailability problem. And so the example in the patent is 200 to 600. And when that experiment was done, it was fully effective at 600. It was not fully effective at 200. The serum osteocalcium was no longer statistically effective. But some of the claims covered raloxifene alone, right? Some of the claims cover raloxifene alone, but without specifying a dosage beyond an effective dosage, which when read in light of the patent applications at 200 to 600 area is the sort of thing one would be thinking of. But you've got a finite, I mean, this was 60. You've got a finite number of, a finite range from which you could test, and 60 comes out right. Why isn't that obvious? Well, because you're not looking at the serum. When you see that it's active at 600 and only partially active at 200, you're looking for something between 200 and 600. You're not looking an order of magnitude down at 60. And we don't have to guess how people perceive this because Jordan in his 1995 article that we cite in our brief and that the trial judge cited in footnote 17 of her opinion says reading that result, high doses will have to be used because raloxifene is extensively metabolized. The higher dose, the 600 milligram dose, will be effective on osteocalcium. That's how people perceived the issue of dosing even after they knew about the basic invention. Then why were the lower dosage amounts tested? That was insight of the inventor. And much of the argument you hear in their brief is relying improperly on the thought processes of the inventor, which by statute and by court decision in this court, LTI versus Klondike, is irrelevant to the obviousness determination. The inventor had a hunch that it might be active at even lower doses and he went into the clinic and he did that experiment. And he found a result that was remarkably surprising. And that was it was active not at 600, not at 200 that it failed in the cancer trial, but an order of magnitude lower at 60. And, Your Honor, that is a magic pill because it turns out that when you treat women for osteoporosis with that drug, not only do you treat osteoporosis, you significantly reduce the risk of invasive breast cancer. That was an absolutely unexpected finding, particularly in view of the failure of the cancer trial. It is found in the trial court's opinion. She chose not to rely on it, feeling she didn't have to, but this court certainly could. On the double patenting issue, we feel that's been waived. That would be a terrible precedent to allow somebody... Can we move on to the particle size patents? And I get to enjoy a moment of supreme irony here, don't I? I knew it would come when I was here. Lily has provided us with a new issue and over the warnings that it didn't really have a standard for application, the vagueness of possession is hard to overcome. Maybe it's fitting that that vague standard should cost Lily a few patents. If that were the ruling of the court and if that were the ruling at ARIAD, I would agree with you, but it's not. And the reason it's not is this invention, the particle size invention, is a very narrow but seemingly very important invention. It's a recognition that if you operate within a particle size range, a narrow range, you get uniform dissolution and uniform bioavailability. And the inventors described that invention and they described a way of doing it. They said, look, we do it by grinding this thing up in a high energy mill down to very fine particle sizes, which Dr. Hartauer testified was, in our reply brief, what we expected to pass... But the patent discloses only bulk riloxamine. No, it discloses bulk riloxamine and it discloses formulations containing particulate riloxamine. And the way it describes making those formulations, and it's clear the claim covers them. It says, formulations comprising or formulated using. Those are two different options. It covers them both. And if you have a formulation, and it's clear, by the way, those are talking about dosage forms. But isn't it your expert that acknowledges at page A3362 that one of skill in the art wouldn't know whether the particles would stay at the same size through formulation or not? He was speaking in general terms. The testimony on the record bearing on... But that's the question. No, no, the question is in this patent application. And Dr. Hartauer testified at page 3325-26... But isn't your expert's general statement enough to support the district court's finding? This is facts, remember. The district court has to clearly air. Granted. First of all, the burden was to show by clear and convincing evidence that the patent was invalid. And if the evidence were inequitable, that doesn't do it. Secondly, Dr. Hartauer's statement was specific to this particular product and molecule where he pointed out when you use high-energy milling, you can expect that you basically end up with ball bearings. And those look past essentially unchanged into the product. And they clearly contemplated, and we are not required as a matter of law to anticipate all other ways of making that product or to describe them. This is just like GamGen versus HMRI in that regard. And they come up with another way to do it. And we know why. We were here a year ago arguing about this. They ballooned the size up, and it crunches down into the particle size range. And we were not required to describe that in order to describe our invention. We showed dozens of examples of formulations containing particles of that size. But there's nothing. Can you show us anything in the specification that points to measuring it when it's no longer in bulk form? It's not there. And it need not be there because that's a question of how to prove infringement. If we could not measure, we would be unable to prove infringement, and that would be the end of the case. And I think this court dealt in the Paxil case with a SmithKline-Beacham versus Apotex with a situation where there was confusion about how do we prove infringement. And the lower court thought that was an indefiniteness problem. And this court said, no, that's not an indefiniteness problem. That's a question of proving infringement. It's exactly the same thing here. What we don't have is a description of how to prove infringement. We contend, as a matter of law, we're not required to have that, that if we can't prove infringement to the satisfaction of the trial court, we will lose. Mr. Lipson, you're arguing that the patent makes clear that the composition both comprises or is formulated using this particular particle. And you make a distinction between the two, comprising or formulated. But it's hard for me to discern what that difference is, because it seems to me you're arguing the formulations to show that you've disclosed the drug comprised of that ingredient. First of all, the invention, the discovery, was that if you have particles of this size, when you formulate them, you are going to get this reasonably stable dissolution environment. And therefore, there are two ways you can do it. You can make the particles to begin with, and you can stick them in there. Or you can somehow or other come up with a way to basically form them in situ. And the point that was made in that specification from the very earliest day it was filed, in the original claim, and I know original claims aren't the end all or be all, but it does show that they had it in mind at the beginning, is we claim formulations that either have these particles in them or are made using these particles. And if we can't prove that they have them in them, if that's what we're relying on, then we're going to lose on infringement. We don't think we lose on written description as well. No, but my point is that you're arguing that you say it describes both formed of those particles or that have those particles in them. But all of the examples are all about how it's formed of those particles. It's nothing about what particles are in there or what shape they're in or what size they are after the composition is made. This is part of the problem, is that this issue was raised basically on the eve of trial. And we were deprived of the opportunity to put in expert reports dealing with the issue, and we're struggling now to deal with a less than perfect record. We do have the testimony of the inventor, and indeed it is the only testimony there directly on the issue, that when you use these high-energy billing procedures and you get the particles down to these small sizes that the claim is talking about, that they can be expected to pass unchanged into the resulting product. And it's just in HMRI, in the Amgen v. HMRI, they showed one way of making HEPA, using an exogenous gene. Somebody found another way to do it, using an endogenous gene. They didn't mention it, but they were claiming the thing. And they weren't required to anticipate all other ways of making the thing, and we're claiming the thing, and we were not required to anticipate all other ways of making the thing. We think it's an infringement question, not a written description issue. Just on the double patent, just because... Back to that, does the footnote Geneva Pharma prohibit us from looking at unexpected results? I think not, and I learned long ago never to tell a judge what a judge was thinking when they wrote an opinion. It's the court's opinion, not a judge's opinion. I understand that. Geneva dealt, when you look at the very end, it dealt with that special situation we've seen in other cases, like the Prozac case, where the later claim was basically anticipated by the earlier claim. And it is indeed true, in that circumstance, things like motivation and unexpected results and commercial success are irrelevant, just as they are to anticipation. But there's a large body of authority, going back to Imre Gladrow in the 1970s and to Imre Wangi in this court, that did look to unexpected results when you have the classic obviousness type case, as indeed one should, since it does parallel the Grand v. John Deere analysis. Would you characterize unexpected results as almost part of the prima facie case in the chemical world? See, I live in the trial court, Your Honor, and when you live in the trial court, it's kind of hard to talk about a prima facie case because we're here at the end of the day, and the evidence is what the evidence is. And the issue is, did they prove by clear and convincing evidence it was obvious? And when you look at the entirety of the evidence, including unexpected results, we feel they have not, could not, either they waived it, or it should be sent back for fact-finding, or the court can, based on the court's finding, that the prior art would have suggested that even if it worked, you needed very high doses of meloxifene, would mean that it should be rejected on the merits. You might want to save your rebuttal, because I'll have to hold you to your time. Thank you. Mr. Rice, we restored three minutes to you. Thank you, Your Honor. I'd like to address the particle size patterns. The district court found that the specification was very clear that the particle size was a control parameter for raw material. That is all that the specification disclosed. If you use a consistent input, in terms of size distribution, you will get a consistent output. That's all the spec talks about. But the inventor, Mr. Hartauer, assumed that he possessed the formulated meloxifene. Your Honor, I think the best answer to that comes from the testimony of Lilly's own expert, which the court quotes, or rather refers to, on page 8112, footnote 56. The court says, In trial, Lilly's expert, Dr. Luke, testified one reading the A11 patent in 1996 without actually measuring the meloxifene. The formulated product would not know whether the meloxifene, subjected to granulation or tabulating compression steps, would increase in size, decrease, or stay the same. So the fact of the matter is, nobody knew what would happen on the output side, in terms of particle size. All they knew is that if they put a consistent size in as a control parameter for the manufacturing process, they'd get a good result on the outside. And that was the issue. And what makes this particularly important is that one of the examples in Lilly's specification talks about lot 5A, a sample that they said was outside the scope in bulk form, and using Mr. Lipsy's terms, that was a sample with a ballooned-up particle size. And yet, all they measured was the bulk. They didn't look afterwards to see if this ballooned-up particle size got crushed down somehow into the particle size range. All they disclosed was the raw material particle size, and they said, this is an example of what falls outside of the invention. And so that reflects that all that's relevant here is the bulk particle size, and it's all the inventors disclosed. What's your response to the argument that the patent and the claims in particular talk about compositions and formulations both? They talk about compositions and formulations, Your Honor, but in terms of size measurement, they're always on the raw material, always on the input side. There is no discussion of, mention of, or examples of measurements on formulated compositions, measurements of the Riloxidine embedded in the later compositions. Well, Mr. Lipsy argues that's an infringement question. It's not an infringement question, Your Honor. It's a claims-code question. The question is, there's a particle-size distribution claim, and the question has to be, what are we measuring? We need to know what we're measuring in order to know how broad the claims are, how narrow it is. Tavis suggested that the claims were limited to measurements on the bulk, and Lilly claimed that it's broad, and that's the issue. Any final comments for us, Mr. Rice? No, Your Honor. Thank you. Thank you, Mr. Lipsy. Your final comments will be relevant here. You have a minute and a half? On the written description issue. That's all we're talking about at this point. Part of the problem, of course, is if the issue is as it's just been described, we never had a trial on that issue. We never had expert reports. If that's going to be the issue, we really ought to go back and get that issue. And lastly, if in fact it is the case that when you formulate it, it can be the same, and indeed everybody seems to say it can be the same, then there are circumstances where the methods we've described will in fact result in formulations that have that part of the science. And our burden is to prove that that's the case when we prove infringement. It's not an invalidity defect in that. Thank you very much. Thank you, Mr. Lipsy. That concludes our morning. Thank you, Your Honor. Thank you, Mr. Rice. The Honorable Court has adjourned until tomorrow morning at 10 o'clock. Thank you.